**JUDGE CARTER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
KARA MANN DESIGN, LLC,

13 CV 2689

Index No.

Plaintiff,

COMPLAINT

-against-

CHELSEA DYNASTY, LLC, THE CHETRIT
GROUP LLC and KING & GROVE HOTELS,

JURY TRIAL
DEMANDED

APR 2 4 2013

Defendants.
----------------------------------------------------------------X

Plaintiff, Kara Mann Design, LLC ("Plaintiff"), by its attorneys Nesenoff & Miltenberg, LLP, as and for its Verified Complaint (the "Complaint"), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1. The Hotel Chelsea is located on 222 West 23rd Street, New York, New York and is a historical landmark of New York City. The Hotel Chelsea has been home to numerous writers, musicians, artists, and actors, and is still home to many residents who continue to live there under state rent regulations. In 2011, the Hotel Chelsea was purchased by defendant, Joseph Chetrit ("Defendant Chetrit"), through his entity, Chelsea Dynasty, LLC ("Defendant Chelsea Dynasty"). Beginning in or about August 2011, Chelsea Dynasty sought to redevelop and renovate the Hotel Chelsea ("Hotel Chelsea Project"). As part of the Hotel Chelsea Project, Defendants hired Plaintiff for its interior design services in August 2011. Plaintiff seeks redress for Defendants' material breach of the parties' contract after Defendant Chelsea Dynasty's bad faith termination of Plaintiff and failure to pay for Plaintiff's services. Plaintiff brings this action for money damages and to obtain relief for causes of action for breach of contract, breach of fiduciary duty and unjust enrichment or quantum meruit.

## THE PARTIES

2. Plaintiff, Kara Mann Design, LLC ("Plaintiff"), is a foreign limited liability company organized under the laws of Illinois, and is authorized to do business in the State of New York. Plaintiff's sole member, Kara Mann, is a citizen of Illinois.

3. Upon information and belief, defendant, Chelsea Dynasty LLC ("Defendant Chelsea Dynasty") is a legal entity doing and transacting business in the State of New York. Upon information and belief, Defendant Chelsea Dynasty owns the Hotel Chelsea and is owned and managed by Joseph Chetrit.

4. Upon information and belief, defendant, The Chetrit Group LLC ("Defendant Chetrit Group") is a legal entity doing and transacting business in the State of New York. Upon information and belief, Defendant Chetrit Group is the parent corporate entity of Defendant Chelsea Dynasty and is also owned and managed by Defendant Chetrit.

5. Upon information and belief, defendant, King & Grove Hotels ("Defendant King & Grove") is a legal entity doing and transacting business in the State of New York. Defendant King & Grove is a boutique hotel brand partnership backed by Defendant Chetrit Group.

6. Defendant Chelsea Dynasty, Defendant Chetrit Group and Defendant King & Grove are sometimes hereinafter collectively referred to as "Defendants".

7. Plaintiff and Defendants are sometimes hereinafter collectively referred to as the "Parties".

## JURISDICTION AND VENUE

8. This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1332 because: (i) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

9. This Court has personal jurisdiction over Defendants on the grounds that they are conducting business and reside within the State of New York.

10. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I. Contract for Hotel Chelsea Project

11. In or around August 2011, Defendants hired Plaintiff for its interior design services to redevelop and renovate the Hotel Chelsea ("Hotel Chelsea Project"). The Parties' contract provided for Plaintiff's interior design services with respect to the ground floor level, cellar level, hotel corridor, food and beverage, 9 guestrooms, and 2 model rooms ("Agreement").

12. Under the Agreement, Plaintiff was entitled to reimbursement of out-of-pocket expenses incurred during the course of work on the Hotel Chelsea Project, including, without limitation, copying, printing, messenger services and taxi fees.

13. The Parties agreed that any additional services performed by Plaintiff would be charged to Defendants at hourly rates outlined in the Agreement. Plaintiff's billable rates ranged

from $125.00 per hour for design associates to $250.00 per hour for the principal. Additional services included anything outside the original scope of work in the Agreement.

### II.   Plaintiff's Performance Of Additional Services As A Result Of Ongoing Issues and Delays Occasioned By Defendants

14.   Almost immediately upon commencing work on the Hotel Chelsea Project, Plaintiff was faced with constant issues occasioned by Defendants' architect of record and Defendants' misdirection, or Defendants' failure to adhere to the terms of the Agreement or basic industry standards.

15.   In fact, due to errors and failures *on the part of Defendants*, which are documented and/or acknowledged in emails by Defendants' principals, employees and agents, Plaintiff had to repeatedly re-do and enlarge the scope of work that was originally contracted for pursuant to the Agreement.

16.   By way of example, Defendants failed to include Plaintiff in the review of all product samples, failed to use a purchasing agent and insisted on ordering substandard materials without consulting Plaintiff. Such failures were not only and in contravention of the Agreement, but they caused significant delays to the completion of the Hotel Chelsea Project. Moreover, Defendants failed to provide Plaintiff with accurate architectural plans, surveys and other information, and failed to cooperate and/or use commercially reasonable care in executing the design intent or in following Plaintiff's specifications and drawings, which were submitted and approved.

17.   Notwithstanding the delays and issues occasioned by the Defendants, Plaintiff performed its services in good faith and met every deadline under the Agreement. Furthermore, and at Defendants' direction, Plaintiff performed additional services significantly beyond the scope of what it was initially hired for. Specifically, Plaintiff expended no less than 10,619

hours to complete approximately 81 additional room types and 40 revisions thereto, together with drawings for 10 unique corridor conditions and re-design based on the architect of record's change in base plan for the Hotel Chelsea Project at Defendants' request.

18. Plaintiff rested assured that it would be compensated for its performance of additional services above and beyond the Agreement because Defendants were aware of Plaintiff's additional work at all times and at no time did Defendants ever advise Plaintiff to cease its additional services.

19. By the end of April 2012, all drawings for the model rooms, hotel corridor and guestrooms originally contracted for were completed, together with additional services of drawings for approximately 81 room types and 40 revisions for the Hotel Chelsea Project. Also by October 2012, all drawings for the ground floor lobby and reception originally contracted for were issued and completed.

20. Amidst Plaintiff's timely and satisfactory performance of additional services, Hurricane Sandy hit New York on October 29, 2012, causing school closures, mandatory evacuations and the deployment of 200 National Guard troops in the city. The aftermath of Hurricane Sandy in New York in 2012 was catastrophic in New York City, its suburbs, and Long Island. In addition to at least 53 deaths from the Hurricane, thousands of New Yorkers encountered electric outages, fire damage, destruction to homes and damages due to severe flooding. Economic losses across New York were estimated to be at least $18 billion.

21. Naturally, the Hotel Chelsea Project did not escape the effects of Hurricane Sandy; with vendors suffering from losses, product damage or temporary closures, delays in meeting original deliverables timelines were inevitable.

22. The Parties had originally aimed to complete the model rooms by November 19, 2012. However, in the wake of Hurricane Sandy, Plaintiff was unable to deliver the model rooms by November 19, 2012 because everything for the model rooms was already in production with Plaintiff's vendors, who had sustained substantial damage. Notwithstanding, Plaintiff communicated to Defendants that Plaintiff was prepared to complete the model rooms just two weeks later by December 3, 2012. Upon information and belief, Defendants extended deadlines for other design, architectural, legal and service firms of the Hotel Chelsea Project and other King & Grove projects as a result of the effects of Hurricane Sandy. At no point did Defendants advise Plaintiff to cease working.

### III. Defendants' Termination of Plaintiff And Subsequent Failure To Pay For Plaintiff's Services

23. Shockingly, and without any bona fide reason therefor, Defendants purportedly sought to terminate Plaintiff as interior designer of the Hotel Chelsea Project on or about November 21, 2012. In terminating Plaintiff, Defendants falsely claimed that Plaintiff had "failed to deliver per the deliverables timeline and specifications". Defendants' claim is flatly contradicted by emails from various principals, employees and agents of the Defendants. To the contrary, not only has Plaintiff met every deadline, but it has also provided work product and services significantly beyond the scope of what it was initially hired for.

24. Moreover, the stated "reason" for Plaintiff's termination was ignorant of the impact of Hurricane Sandy (October 29, 2012) on the Hotel Chelsea Project, a clear force majeure. Considering that the drawings for the model rooms were already completed, that all furniture fittings and equipment were already in production with Plaintiff's vendors, that Plaintiff was prepared to deliver the model rooms just two (2) weeks later, combined with the fact that Defendants extended deadlines for other design, architectural, legal and service firms of the

Hotel Chelsea Project in the wake of Hurricane Sandy, it is incongruous that Plaintiff would be terminated for failing to deliver the model room installation by November 21, 2012.

25. Defendants' termination of the Plaintiff was just one day before the Thanksgiving holiday, and was made with Defendants' knowledge that Plaintiff's vendors were already paid, and that the installation was well underway. Defendants' termination of the Plaintiff was an act of bad faith and is indicative of Defendants' ulterior motives to usurp Plaintiff's work product for its sole benefit without compensation therefor.

26. In connection with their termination of Plaintiff, Defendants stated their intent to retain "full ownership of all instruments of service, including but not limited to design drawings, CAD plans and renderings provided by KMD under this agreement". However, Plaintiff never gave its consent or authority (whether impliedly or otherwise) for Defendants to use or license Plaintiff's work product, design drawings, CAD plans, renderings and intellectual property without compensation therefor. To date, Defendants continue to retain the benefit of Plaintiff's work product and have failed to return same to Plaintiff. Defendants' retention is without basis insofar as Plaintiff has a common law copyright in its interior design plans, drawings, specifications, concepts and/or work product.

27. In light of Defendants' significant role in the delays of the Hotel Chelsea Project and the impact of Hurricane Sandy, Defendants' termination of Plaintiff was made in bad faith and purely motivated by their intent to avoid payment of Plaintiff's additional services and in an effort to usurp Plaintiff's intellectual property.

28. To date, and despite written demand therefor, Defendants have failed to pay Plaintiff for the entirety of its services for the Hotel Chelsea Project, which amounts to $2,098,876.88 pursuant to the Agreement.

## AS AND FOR THE FIRST CAUSE OF ACTION
### Breach of Contract

29. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

30. In or around August 2011, the parties entered into the Agreement, whereby Defendants agreed to pay Plaintiff $350,000 for its services as an interior designer for the Hotel Chelsea Project with respect to the ground floor level, cellar level, hotel corridor, food and beverage, 9 guestrooms, and 2 model rooms.

31. The parties agreed that any additional services performed by Plaintiff would be charged to Defendants at the hourly rates outlined in the Agreement.

32. At the Defendants' direction, Plaintiff performed significant additional services with regard to the Hotel Chelsea Project, which Defendants accepted.

33. Plaintiff has performed all of its obligations in good faith as set forth in the Agreement.

34. Despite Plaintiff's demand, Defendants have failed to make full payment to Plaintiff pursuant to the Agreement.

35. As a result of this breach, Plaintiff is entitled to damages in the amount of $2,098,876.88, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION
### Quantum Meruit or Unjust Enrichment

36. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

37. In the alternative to its breach of contract claim, Defendants are liable to Plaintiff under the doctrines of quantum meruit or unjust enrichment.

38. Plaintiff provided significant value to Defendants with respect to the Hotel Chelsea Project, in the form of its substantial interior design services, as set forth above.

39. In good faith and at the direction of Defendants, Plaintiff has furnished interior design services for the Hotel Chelsea Project, which was accepted by Defendants.

40. Plaintiff has bestowed a significant benefit upon Defendants and Defendants accepted this benefit while understanding that Plaintiff expected to receive reasonable compensation in return.

41. Nevertheless, Defendants have not paid Plaintiff the reasonable value of its services.

42. Defendants have been unjustly enriched from Plaintiffs services.

43. By reason of the foregoing, Defendants are liable to Plaintiff in quantum meruit or unjust enrichment for the fair market value of the unpaid labor and materials in the amount of $2,098,876.88, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE THIRD CAUSE OF ACTION
**Declaratory Judgment**

44. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

45. Defendant has committed material breaches of the parties' Agreement.

46. Plaintiff has timely complied with each and all of its obligations as set forth in the Agreement.

9

47. As a result of the foregoing, there exists a justiciable controversy between the parties regarding their respective rights and obligations under the Agreement, including, without limitation, whether Plaintiff's common law copyright in her interior design plans, drawings, specifications, concepts and/or work product revert back to Plaintiff upon Defendants' material breach of the Agreement and bad faith termination of Plaintiff.

48. By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) Defendants are not permitted to use any of Plaintiff's work product; (ii) any work product that Defendants have in their possession must be destroyed immediately; and (iii) all existing work completed through the use of Plaintiff's work product must be removed.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i) on the first cause of action for breach of contract, a judgment awarding Plaintiff damages as against Defendants, jointly and severally, in the amount of $2,098,876.88, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii) on the second cause of action for unjust enrichment, a judgment awarding Plaintiff damages as against Defendants, jointly and severally, in the amount of $2,098,876.88, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on the third cause of action for declaratory judgment, a judicial declaration that (i) Defendants are not permitted to use any of Plaintiff's work product; (ii) any work product that Defendants have in their possession must be destroyed immediately; and (iii) all existing work completed through the use of Plaintiff's work product must be removed; and

  (iv)  awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
    April 22, 2013

                 NESENOFF & MILTENBERG, LLP

                 By: _____
                 Andrew T. Miltenberg, Esq. (AM 7006)
                 Kimberly C. Lau, Esq. (KL 9374)
                 **Attorneys for Plaintiff**
                 363 Seventh Avenue, Fifth Floor
                 New York, New York 10001
                 (212) 736-4500